**Serobian Law, Inc.**
**Liana Serobian, Esq. CSB 235466**
100 North Brand Blvd., Suite 600
Glendale, CA 91203
Telephone: (818) 539-2249
Email: L.Serobian@yahoo.com

Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES

| | |
|---|---|
| POSHVILLE, INC., A CALIFORNIA CORP., individually and on behalf of all other similarly situated entities (collectively, the "Class"),<br><br>               Plaintiffs,<br><br>vs.<br><br>PAWNEE LEASING, A COLORADO CORP.; FIRST PACIFIC FUNDING, A WASHINGTON CORP.; Jessy O'Day, in his personal capacity; Jill Lottermoser, in her personal capacity; Becca Papachek, in her personal capacity; Kathy O'Keefe, in her personal capacity; Kenny Fitzgerald, in his personal capacity; Mike Prenzlow, in his personal capacity; Amanda L. Graham, in her personal capacity; DOES 1 – 100 inclusive;<br><br>               Defendants. | Case No.: 2:21-cv-1465<br><br>**PLAINTIFFS' COMPLAINT FOR DAMAGES**<br>(1) Illegality/Impossibility of Performance and Frustration of Purpose<br>(2) Supervening Impracticability<br>(3) Discharge Under Cal.Civ.Code 1511<br>(4) & (5) Breach of Covenants of Fair Dealing and Good Faith<br>(6) Declaratory Relief<br>(7) Violation of Cal. Bus. & Prof. Code 17200, et seq.<br>(8) Unjust Enrichment<br>(9) & (10) Violation of Truth In Lending and Consumer Leasing Acts<br>(11) & (12) Violation of Colorado and Washington Consumer Protection Acts<br>(13) & (14) Breach of Covenants of Fair Dealing and Good Faith<br>(15) & (16) Tortious Interference and Unjust Enrichment<br><br>**DEMAND FOR JURY TRIAL AND PRELIMINARY INJUNCTION** |

## JURISDICTION

1.   The Court has jurisdiction over this putative class action pursuant to 28 U.S.C. § 1332(d)(2), because the amount in controversy exceeds $5 million and at least one member in the proposed class of over 100 members is a citizen of a state different from Pawnee Leasing (Colorado) and First Pacific Funding (Washington).

2.   At the least, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), which reads: "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between - (1) citizens of different States; . . ."

## VENUE

3.   Venue is proper in the District Court for the Central District of California pursuant to 28 U.S.C. §1391(e)(2) because all, if not substantial part of the events giving rise to Plaintiffs' claims occurred in this district. Further, Plaintiff is a single-shareholder owned S-Corporation, whose owner is a single mother of three children with primary custody of the minors, and cannot leave the children, especially during Covid-19 pandemic, to litigate the matter in any other location than where the business and the lease equipment in questions are located.

**PLAINTIFFS**

4.  POSHVILLE, INC., A CALIFORNIA CORP., individually and on behalf of all other similarly situated entities and small businesses (collectively, the "Class").

**CORPORATE DEFENDANTS**

5.  PAWNEE LEASING, A COLORADO CORP.;

6.  FIRST PACIFIC FUNDING, A WASHINGTON CORP.

7.  Plaintiffs hereby sue the corporate entities individually and also under the doctrine of Respondent Superior for the actions and failures to act of each individually named defendant who is not an entity herein, are alleged in the alternative to have been conducted or failed to have been performed either in their individual capacities, or as employees of their respective employing entity defendants on behalf of such entity defendants and under color of state law.

8.  Plaintiffs are informed and believe and thereon allege that the maintenance of the aforesaid policies, practices, customs, culture, and procedures, lack of training, and/or inadequate training, constitute a basis for liability individually against Pawnee Leasing and First Pacific Funding as well as under the doctrine of Respondent Superior, and hereby seek to hold Pawnee Leasing and First Pacific Funding individually liable and/or responsible in whole or in part for the

conduct of the individual defendants and the damages naturally resulting therefrom.

## **INDIVIDUAL DEFENDANTS**

9. DEFENDANTS: Jessy O'Day, in his personal capacity; Jill Lottermoser, in her personal capacity; Becca Papachek, in her personal capacity; Kathy O'Keefe, in her personal capacity; Kenny Fitzgerald, in his personal capacity; Mike Prenzlow, in his personal capacity; Amanda L. Graham, in her personal capacity; DOES 1 – 10 inclusive; whose acts as alleged herein were performed in their personal capacity, were at all times material hereto, upon Plaintiffs' information and belief, are workers and supervising workers, or chief financial officers employed by Pawnee Leasing and/or First Pacific Funding.

10. Time period for emails communications by PoshVille with individual Defendants on behalf of their respond superior employers that support the allegations in this complaint are as follows:

- Jill Lottermoser at First Pacific Funding – November 2017, May 2019

- Jessy O'Neal at First Pacific Funding – October and November 2017, May 2019

- Mike Prenzlow at Pawnee Leasing - November 22, 2017

- Becca at Pawnee Leasing – mid-September 2018 to February 2020

- Kathy O'Keefe – July 2020 to October 2020

- Kenny Fitzgerald – mid-September 2018 to February 4, 2021

- Amanda Graham – December 2020 to February 2021

## **GENERAL ALLEGATIONS**

11. Sometime in September 2017, LS, the sole shareholder and officer of PoshVille, Inc., now a single mother of three minors, decided to create a custom-themed children's indoor playground and party venue so that it would be a joyous place for families to spend time together, celebrate birthdays, and make memories.

12. LS incorporated the playground and party venue business as PoshVille, Inc., a California corporation, on October 20, 2017, as became its sole shareholder and president. PoshVille obtained a dba of PoshParis in Los Angeles County and began operation under that dba. On PoshVille, Inc.'s located a physical venue for the playground at the Paseo mall in Pasadena, California, remodeled and custom-designed the entire venue, custom-designed and chose the play structures that were to go inside the venue and purchased the play equipment, the furniture, toys, and other necessities that were needed to operate the business.

13. As part of this process, PoshVille made contact with Lilliput Play Homes (Lilliput) and in a series of long email and telephone contacts for about two months, paid for 3-D images of her imagined playground with custom-themed playhouses inside. PoshVille then decided to order two of the playhouses (made of carton but designed to be pretend plays homes) to be installed in the physical location of the playground at the Paseo, an outdoor mall in Pasadena, California. The total price for the two playhouses chosen was about $17,723, with tax and delivery cost including totaling $19,418.

14. LS, on behalf of PoshVille, googled for a business loan for PoshVille to make the purchase from Lilliput and other vendors, and came across an advertisement from First Pacific Funding, and left a message. Jessy O'Day from First Pacific Funding (10700 Woodinville Drive, Bothell, WA 98011) called LS back and LS explained that PoshVille wanted to apply for business loan to purchase the playhouses. In a series of emails, Jessy O'Day sent PoshVille details about the "purchase" of the equipment and stated that the business was approved for up to $50,000 business loan.

15. Never ever did those emails from Jessy O'Day to PoshVille make any sort of mention that the funding First Pacific Funding was setting up was the following: 1) for its finance vendor, Pawnee Leasing, to purchase and become the owner of the playhouses from Lilliput for $19,418 that LS has previously

designed/chosen, hence, sort of theft of her intellectual property, 2) the "total cost of contract" was "$21,054.19," on the agreement, which made it appear as a reasonable cost after adding reasonable interest rate to the $19,418 price on the invoice Lilliput had created for PoshVille, and 3) under the contract terms, however, Pawnee Leasing would be the purchaser of the playhouses and would than lease the same playhouses to PoshVille as "lease equipment" for a five-year lease term totaling about $52,494.75, however, nowhere did the contract include this total price;  4) after this 5-year lease term, the "lease" contract requires the playhouses to be returned to Pawnee Leasing, or if PoshVille chose to keep these, PoshVille had to keep paying 50% of the monthly payment for life ($477 a month), or PoshVille could choose to purchase the playhouses from Pawnee Leasing at the 20% value of the contract price (about $5000).

16. In other words, the $19,418 Pawnee Leasing was paying Lilliput was to be milked from PoshVille with personal guarantee from LS at skyrocketing and utterly unjust interest rate for life under the disguise of non-existent "equipment lease." However, Pawnee Leasing had never been in possession of this equipment nor had it any knowledge of it until the time PoshVille and Lilliput had entered into a contract for the purchase of the same by PoshVille. Thus, Pawnee Leasing and First Pacific Funding tortiously interfered in the existing

agreement between PoshVille and Lilliput by changing the ownership to Pawnee

Leasing without PoshVille's knowledge.

17. On November 15, 2017, Jessy O'Day from First Pacific Funding emailed

PoshVille regarding the final purchase contract PoshVille and Lilliput had

agreed on. "Hey Liana. I got the final invoice and noticed the price has dropped

dramatically. Did we still want to use the approval for 33k for the playhouses

now that the final cost is down to 19,418$? I think it makes much more sense to

save this bigger approval now for the play equipment which was more

expensive, and use the approval that is only good up to 25k for this **purchase**.

Now that the total amount is so much lower, your down payment would be

much less. Just let me know what you would like to do, I didn't want to move

forward before confirming which you think is best!  Thank you Ma'am! I will

start generating Docs the moment I hear back."

18. At the end of the day, Jessy O'Day created an impression and represented to

LS that PoshVille was purchasing the playhouses as its business equipment.

However, Jessy O'Day made a call to Lilliput to change the name of ownership

from PoshVille to Pawnee Leasing on the invoice under the guise that such is

needed for Lilliput to be paid by Pawnee Leasing, but it was a disguise to

accomplish this deceitful contract terms noted above. LS learned of this only

after the fact and from Lilliput.  This again shows that Pawnee Leasing and First

Pacific Funding tortiously interfered in the existing agreement between PoshVille and Lilliput by changing the ownership to Pawnee Leasing without PoshVille's knowledge.

19. The final "lease equipment" contract itself was emailed to PoshVille by DocuSign on November 16, 2017, without a prior pdf version to review, and DocuSign itself had limited visibility as to the text of the contract terms. The DocuSign title of the document in the email also used the word "**purchase**," and not "lease equipment" or "rental contract" so for PoshVille to recognize the fraud, misrepresentation, and at the least, the mistake of the terms that the equipment designed for PoshVille, hence, its intellectual property, will be owned by Pawnee Leasing, who would then lease it back to PoshVille for enormous and utterly unfair financial gain with no expiration date.

20. On November 16, 2017, PoshVille signed what it believed to be a purchase of playhouses from Lilliput for $19,418 for a "total contract price $21,054.19" as the agreement stated on the first page.

21. On November 22, 2017, Mike Prenzlow, CFO at Pawnee Leasing, signed the contract on its behalf.  Under its terms, the contract is described as follows: "This is a finance lease under Article 2A of the Uniform Commercial Code (the "UCC") as adopted by the State of Colorado."

22. PoshVille only became aware of the true nature of the "lease equipment"
contract when after making several months of payments on the contract, it
randomly called Pawnee Leasing to inquire how much was left on the contract
to pay off the purchase. At the time, Becca Papachek at Pawnee Leasing
explained that some $50,000 remained to the greatest shock of PoshVille.

23. Further, Jesse O'Day and Jill Lottermoser at First Pacific Funding requested
that PoshVille provide a Certificate of Liability Insurance prior to Pawnee
Leasing signing the contract and funding the purchase of the playhouses from
Lilliput. On November 16, 2017, PoshVilled emailed to Jill Lottermoster the
Certificate of Liability and received an email response thanking for the
certificate, but no other concerns were not. The parties signed the contact
through DocuSing and again no problems regarding the insurance were noted by
either Pawnee Leasing or First Pacific Funding. Remarkably, in March 2018,
some five months after the signing of the contract, Jill Lottermoser informed
PoshVille that the insurance previously provided, on which the loan was funded,
was insufficient and that a fee of $210.54 a month with taxes, interest, and fees
was due. No other alternatives to this fee were provided or explained to
PoshVille. When LS as PoshVille's officer emailed back complaining as to why
this was only later indicated, after the funding was approved, Jill did not respond
that that email. Pawnee Leasing deducted through ACH ten (10) payments of

$210.54 each automatically from PoshVille's business account for this so called "lack" of equipment insurance, without prior approval for this fee in the lease agreement. Still the outstanding balance for the lack of this insurance has been charged on the account as detailed below and has grown substantially until now.

24. PoshVille later made contact with an independent insurance and learned that the equipment insurance for the playhouses had an annual fee of $100, and did purchase the said insurance in May 2019 pro-rated at about $50 for the rest of 2019. PoshVille then provided Pawnee Leasing with proof of this insurance and the $210.54 monthly fees then supposedly stopped, however, the balance remained on the account, with monthly bills being sent to PoshVille and LS separately for payment, while accruing interest. This insurance expired in November 2020, but the carrier and all other carriers refused to renew because the business was non-operational due to Covid-19 pandemic. Pawnee Leasing began charging PoshVille $210.54 again per months during Covid-19 pandemic even when PoshVille simply cannot obtain such insurance.

25. For a period of about two and a half years, PoshVille has presented Pawnee Leasing with legal theories similar to ones briefed in this complaint, in emails and letters to their individually named Defendants - Becca Papachek, Kenny Fitzgerald, Kathy O'Keefe and Amanda Graham at Pawnee Leasing. However, each and every effort to reason, cancel, settle, obtain restitution or convert the

lease agreement to a purchase contract has been utterly rejected by Pawnee Leasing under the guise that PoshVille has signed it, LS has personally guaranteed it, and that was the end of all discussion. No reasonable explanation for the ever-growing and unjust and hidden fees, interest, later charges, were provided.

26. On May 14, 2019, PoshVille sent to both Pawnee Leasing and First Pacific Funding a formal Demand for Rescission of Contract, Cessation of Collections, Restitution, Disgorgement of Ill-Gotten Gains, And Other Equitable Relief Under Section 5(a) and 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), 45(a). A copy of this Demand Letter with exhibits attached, totaling 27 pages, was emailed to Federal Trade Commission at smallbizfinance@ftc.gov. Federal Trade Commission sent a thank you to PoshVille for informing them of the issue, but did not get involved. Neither Pawnee Leasing nor First Pacific Funding made a formal response. Pawnee Leasing's position communicated by way of several representative, named Defendants herein, by email was that you signed, you pay.

27. On March 16, 2020, PoshVille was ordered closed by the federal, state, and local government orders due to the Covid-19 pandemic as it was a family entertainment party venue. It's indoor live venue for children to play and party continuous to be prohibited to operate in order to prevent and stop the spread of

the Covid-19 pandemic. Further, the PoshVille indoor playground and party venue was asked to evict its location from the Paseo mall in Pasadena, CA, at the end of the lease term on November 30, 2020, because it was non-operational and unable to pay rent. The playhouses and all of the other equipment are presently in a storage in an unknown condition and contaminated by prior exposure to Covid-19 prior to closure. Ultimately, the business was shattered by this global Covid-19 pandemic and only left with debt and liability and inability to operate.

28. While utterly objecting to the contract once the true terms were made known to it and always attempting to settle it, still, in good faith and to avoid damage to the personal credit of its sole shareholder and guarantor, PoshVille has paid Pawnee Leasing $ 954.45 a month under the "lease equipment" contract from its inception until legally permitted not to pay for three months under the forbearance approved by Pawnee Leasing as a result of the Covid-19 pandemic. As of this complaint, PoshVille has paid towards the contract about $28,633.50 in monthly payments, $ 342.50 in initial administrative expense, $2100 in insurance fees, $731.75 in check, and LA County Property Taxes paid directly by PoshVille to LA County as the owner of the equipment. There is an outstanding balance of close to $8000 that Pawnee Leasing is attempting to collect for more of the insurance fees,

interests, late charges, county taxes it is supposed to pay as the owner of the

equipment, and other fees, none of which are disclosed in the lease contract.

29. Specifically, when Covid-19 started, under the Cares Act, PoshVille applied

for the forbearance of the monthly lease payment and Pawnee Leasing

approved two months of no payment for April and May 2020. It collected

lease payment in its full amount in June 2020 although the business

remained closed. PoshVille again reached out to Pawnee Leasing for

continued forbearance and was forwarded to Kathy O'Keefe at Pawnee

offered. She approved no-payment of monthly lease for July and August

2020, but said thereafter PoshVille must pay 50% of the rent amount

regardless if the business was non-operational.  Then, in August 2020,

Pawnee Leasing attempted to collect fund from PoshVille's bank account,

and PoshVille placed a stop payment on their automatic ACH withdrawals.

While the forbearance period was still active and payment was not yet due,

PoshVille informed Kathy O'Keefe that the business remained closed due to

CA Governor's orders and the playhouses were non-operational.

30. On September 28, 2020, Kathy O'Keefe at sent a notice mischaracterizing

the forbearance as "default" and titling it "Final Notice to Cure Default and

Notice to Accelerate" in ten days, when there was no prior notice of default.

The letter states that Pawnee Leasing will seek balloon payment of $33,600

remaining under "equipment lease" contract in 10 days, while having full knowledge that the business was closed and their equipment was not being used.

31. On September 30, 2020, PoshVille sent a Cease and Desist letter to Pawnee Leasing to stop the default and acceleration of the $33,600 balloon payment when such was issued after PoshVille was in an approved forbearance due to Covid-19 pandemic. Pawnee Leasing did not stop and PoshVille and LS under the personal guarantee was at risk of financial and credit ruin.

32. As such, on October 2, 2020, PoshVille filed formal complaints with both the Consumer Financial Protection Bureau (CFPB) and California Department of Financial Protection and Innovation (DFPI) against Pawnee Leasing and First Pacific Funding, asking them to investigate the above-noted scheme and the later fraudulent "Default Letter" by Pawnee Leasing issued after an approved forbearance period due to Covid-19, all in unfair attempt to collect as a balloon payment the entire lease term on non-operational lease equipment in a shattered business shut down by Covid. On October 2, 2020, CDPB responded by email that they were unable to forward the complaint to the businesses for a response, because they didn't deal with such issues or the businesses were not no their list. DFPI sent an email letter to PoshVille statin that it forwarded the complaint to the CA Office of the

Attorney General for review on October 5, 2020. However, the Office of the Attorney sent a thank you letter for informing them of the concerns above, but did not intervene. The letter said that the decision not to intervene didn't mean that the complaint had no merit. On October 30, 2020, DFPI closed its complaint against First Pacific Funding, but stated the closing letter that it didn't mean the complaint had no merit.

33. In response to these complaints filed, Pawnee Leasing did not formally respond, however, Kenny and Amanda reinitiated the forbearance process by demanding that PoshVille continue to make monthly payments on a non-existent lease equipment of a shattered business for $477 a month until the regular payment of $954 was to be reinstated by Pawnee Leasing. On Pawnee Leasing's behalf, Kenny rejected PoshVille's offer to cancel the contract with PoshVille utilizing buy-out clause of the contract 20% of cost purchase price, at $5000.

34. In a serious of emails from October 2020 to February 2021, Kenny informed PoshVille that Pawnee Leasing didn't want or need the lease equipment (the two playhouses) and that PoshVille could dispose of the lease equipment in any way it wanted, but needed to make a lum sum payment of $25,000 to Pawnee Leasing within a specified time period to cancel the lease equipment contract early. This $25,000 demanded by Pawnee Leasing was in addition

to the close to $33,000 PoshVille had already paid Pawnee Leasing for its
payment of the playhouses from Lilliput for $19,418. Kenny's last email to
PoshVille on February 4, 2021, was a demand for a wire transfer of the $477
payment or the matter would be escalated to collections and litigation,
supposedly with another "Notice to Accelerate" that was issued on
September 28, 2020, by Kathy O'Keefe at Pawnee Leasing with a demand
for $33,600 paid in 10 days by PoshVille or continue to make monthly
payments. However, this time the amount would be several thousand more
since Pawnee Leasing has charged insurance fee, late fees, interests, full
month's rent during the approved forbearance period.

35. In a series of emails from December 2020 to February 2021, Amanda did not
respond to any of PoshVille's requests for settlement of the matter for the
purchase price, but referred it to Kenny. She did emailed PoshVille several
times demanding the monthly payment of $477, last email being on February
16, 2021, with the threat that the matter would be escalated to collections and
litigation, supposedly with another "Notice to Accelerate" that was issued on
September 28, 2020, by Kathy O'Keefe at Pawnee Leasing, as described
above.

36. PoshVille in various emails confronted Pawnee Leasing and First Pacific
Funding to rescind contract, waive fees, restitution, unjust enrichment on the

formation of the funding as "lease" versus "purchase" by PoshVille from Lilliput of the playhouses LS had designed and selected, settle the matter, stop monthly payments due to Covid-19 shattering the business and resulting in Pawnee Leasing collecting lease payments without providing equipment benefit, and other equitable remedies, however, all were ignored, rejected and the only counteroffer was for PoshVille to pay an additional $25,000 to Pawnee Leasing on top of close to $33,000 it has paid on a purchase that cost Pawnee Leasing $19,418.

37. As of January 20, 2021, Pawnee Leasing has sent PoshVille an outstanding invoice of about $7,071.09, which will be at least $8025.54 in the February 2021 invoice, in addition to the contract terms it hopes to collect on the non-operational business and while forfeiting return of its lease equipment. None of the deposits, fees, multitude of finance charges, and interests Pawnee Leasing is billing PoshVille for are included in the lease agreement itself and are in bad faith and unconscious on their own.

- The invoice includes all the late fees and interest on the $731.75 check as deposit from PoshVille it cashed on January 8, 2018, however, this deposit does not appear anywhere in the lease agreement.

- The invoice includes the full monthly rent of $954.45 for months of December 2020, January and February 2021, when Pawnee Leasing knows that PoshVille has been evicted from its physical location, the play and party business is shut down due to Covid, and its lease equipment is non-operational in the storage. Indeed, Pawnee Leasing has forfeited any claims for further monthly payments as it does not wish, per Kenny, for the return of its lease equipment under any circumstance.

- The invoice includes late charges of $143.17 from October 2020 to February 2021 while PoshVille was in approved forbearance and paid Pawnee Leasing $477 a month until December 2020 even when the business was evicted from its physical location and the business itself shut down by government orders due to Covid 19.

- The invoice includes the $210.54 a month "No Proof of Insurance" fee imposed since November 25, 2020, when the existing insurance expired and the insurance companies refused to renew and/or provide new insurance to a non-operational business as PoshVille is at this time.

- The invoice includes Los Angeles County taxes since 2018 that Pawnee Leasing as the owner of the lease equipment should be presumably liable for.

- The invoice includes a multitude of finance charges and late fees that is difficult to discern and understand.

38. Pawnee Leasing took this stance to bully PoshVille, a small children's entertainment business and its sole shareholder/guarantor, a divorced single mother of three children, who practically lost her business to Covid-19, while having to deal with shut down schools and childcare, and other post-Covid logistical and financial problems. Most remarkable of all is the fact that Pawnee Leasing has essentially chosen to early terminate its part of the lease agreement by forfeiting its rights to the lease equipment and with full knowledge that it's lease equipment is not in use or operation, yet it want to collect all of the contract term and more in fees, charges, interests, insurance penalty when no insurance is available on the market for PoshVille's non-operational status, and other gravely and utterly unconscious acts in bad faith all for its unilateral financial gain and unjust enrichment.

39. This entire ordeal with Pawnee Leasing trying to bully and cheat LS and PoshVille any utterly way possible, while having a loved business lost to the Covid-19 pandemic, having three minors to care for as primary parent with

Covid-19 restrictions, dealing with school closures, and other financial problems, has caused LS great emotional harm, anguish, and distress to say the least. It also keeps LS and PoshVille in constant fear of financial and credit reporting ruin that will have lasting and damaging effects, which is what Pawnee Leasing has been using to bully PoshVille to continue to make payments on non-operational lease equipment and to pay all of the extra fees, interests, penalties, taxes  - none of which had been disclosed in the lease agreement.

40. Both Pawnee Leasing and First Pacific Funding are liable both individually and under the doctrine of Respondent Superior for the actions of their employees and have indeed instructed it them to act in this way for their financial gain and benefit. It appears that such conduct by these entities and their employees are long-standing and have been orchestrated to defraud small businesses and their individual shareholder owners into personal liability by bulling them into performing under the pretend "lease equipment" contracts out of fear of litigation costs and judgements against them, their families, and their homes.

41. Further discovery is necessary to investigate the scheme between Pawnee Leasing and its financial vendors, like First Pacific Funding here, that result in utterly unfair, fraudulent, misleading misrepresentations to fashion actual

purchase contracts into "lease equipment" contracts to trap the lessees with utterly unfair financial terms and place them in great financial disadvantage. There are many similarly situated small businesses complaining about similar circumstances they have encountered with Pawnee Leasing and the financial vendors it enters into misleading schemes with to mask the funding as called "lease equipment" contracts, yet it never produces, possesses, or leases any sort of actual equipment prior to such contracts. Hence, a class certification is appropriate for the similarly mislead small businesses throughout the United States in violations of the claims in this complaint.

## **DAMAGES**

42. The actions of Pawnee Leasing and First Pacific Funding, and each of their respective workers and/or supervising workers sued here in their individual capacity have caused extreme financial damage, fear of further financial and property loss, and emotional distress to the Plaintiff and its officer/shareholder, and all similarly situated entities.

43. As a result of the conduct of Defendants, Plaintiff and its officer/shareholder, and all similarly situated entities, suffered loss of property rights to its equipment, great loss of finances and continued risk of ever severe financial loss and harm to their livelihood, fear of negative financial credit reporting, and severe emotional distress, anxiety and general damage to their psyche, to such an extent as to cause physical manifestations of pain and symptoms of nausea and severe depression, including but not limited to sleeplessness, headaches, rapid weight loss, fatigue, loss of appetite, malaise, irritability, inability to focus, a generalized fear and mistrust in such business dealings.

44. The Plaintiff and all similarly situated Plaintiffs incurred expenses and fees in the legal matters that were unnecessarily caused by the actions of the Defendants, in an amount to be proven at time of trial. Therefore, Plaintiffs seek reasonable attorneys' fees and costs for the litigation, and the same to all similarly situated entities.

45. Plaintiff seek discharge of the lease equipment contract and any and all liability under the contract or obligation to perform by PoshVille and personal guarantor of the contract, and all similarly situated entities.

46. Plaintiff seeks transfer of title of the lease equipment, the two playhouses, to PoshVille and right to dispose of it any way PoshVille deems appropriate. All similarly situated Plaintiffs seek similar reinstatement of property rights.

47. Plaintiff and the Class seek an award of restitution, actual and consequential damages, declaratory relief, exemplary (punitive) damages as allowed under federal law and state laws against all of the Defendants both under their individual capacities as well as under the doctrine of respondent superior to make an example of and punish defendants, and in the hope of deterring future conduct of a similar nature.

## ALLEGATIONS

## CAUSES OF ACTION RELATING TO DISCHARGE OF THE LEASE EQUIPMENT CONTRACT

- **COUNT ONE**: DISCHARGE OF CONTRACT BY ILLEGALITY/IMPOSSIBILITY/IMPRACTICABILITY OF PERFORMANCE AND FRUSTRATION OF PURPOSE
- **COUNT TWO**: DISCHARGE OF CONTRACT BY SUPERVENING IMPRACTICABILITY

**COUNT THREE**: DISCHARGE OF CONTRACT UNDER Cal.Civ.Code § 1511: § 1511. CAUSES EXCUSING PERFORMANCE

**COUNT FOUR**: BREACH OF IMPLIED COVENANT OF FAIR DEALING

**COUNT FIVE**: BREACH OF IMPLIED COVENANT OF GOOD FAITH

**COUNT SIX**: DECLARATORY RELIEF

**COUNT SEVEN**: UNFAIR BUSINESS PRACTICES  Cal. Bus. & Prof. Code §§ 17200, et seq

**COUNT EIGHT**: UNJUST ENRICHMENT

**By Plaintiff Against All Pawnee Leasing Individual and Respondent Superior Defendants, and Does 1 through 10, Inclusive**

48. Plaintiff re-alleges and incorporates paragraphs above, as though fully set forth at this point.

49. Plaintiff is informed and believes and thereon alleges that PoshVille has been ordered by federal, state, and local authorities to shut down its children's indoor play and party operation to avoid the spread of the Covid-19 pandemic since March 16, 2020. The Paseo outdoor mall in Pasadena, California, where the venue was located asked PoshVille to vacate the premises once the lease on the physical location expired November 30, 2020.

50. Plaintiff is informed and believes and thereon alleges that the state of global affairs as a result of the Covid-19 health pandemic, described in great detail below, has thus rendered PoshVille a shattered business. This makes it unnecessary to consider whether PoshVille has shown that it did not expressly or impliedly agree to perform in spite of any impracticability that would otherwise justify non-performance. Indeed, any operation by PoshVille to use the lease equipment (the two playhouses in question in its play and party venue) would be illegal and sanctionable by such authorities. Also, any continued payment under the contract by PoshVille was only after all remedies to cancel the contract were exhausted by PoshVille, including formal complaints filed with governing authorities to no avail. Multitude of requests made in emails to various individual defendants working for

Pawnee Leasing have been simply ignored and rejected by Pawnee Leasing with threats of collections, lawsuit, judgement and financial loss and damage to PoshVille and is sole shareholder L.S. a single mother of three minors. As such, any payments by PoshVille were made under the duress of threat of balloon collection by Pawnee Leasing and financial and credit damage to the business and its sole shareholder owner, L.S.,who heavily relies on her good financial credit to support her children.

51. Plaintiff is informed and believes and thereon alleges that the lease equipment is contaminated due to exposure to Covid-19 prior to being shut down in mid-March 2020, hence, its recycle and reuse is likely hazardous unless great measures are taken to sanitize it if at all possible. In the months prior to its ordered closure, it is likely that customers, workers and/or other visitors to the venue were infected with COVID-19 and thereby infected the leased equipment with COVID-19 and make it unsafe and unusable. Covid-19 is a physical substance, that it lives on and is active on inert physical surfaces, and is also emitted into the air, such that it's presence renders physical property in their vicinity unsafe and unusable.  (See Studio 417, Inc. v. Cincinnati Ins. Co., 2020 WL 4692385, at (W.D. Mo. Aug. 12, 2020.) For these very reasons, presumably, the Pawnee Leasing does not want the lease

equipment returned to it under any circumstance and has asked PoshVille to dispose of it any way it chooses.

52. Plaintiff is informed and believes and thereon alleges that Pawnee Leasing by multitude of emails form its individually-named defendants, Becca, Kathy, Kenny, and Amanda, post-Covid-19 shut down, has been harassing PoshVille to continue to make payments under the lease to its full term now at $477 and later to be increased to $954 (5-year term with then post-rent or purchase options) or pay $25,000 to Pawnee Leasing to get out of the impossible and impractical contract for non-operational lease equipment on a now shuttered business. And this is after Pawnee Leasing has already collected around $33,000 from PoshVille on equipment it paid $19,418 to Lilliput in November 2017 for the playhouses L.S. has designed/chosen. Pawnee Leasing has otherwise threatened PoshVille to face collection, litigation, judgement, financial loss, and damage to financial credit to both PoshVille and its single shareholder, L.S., a single mother of three minors, who has personally guaranteed under the lease contract. Pawnee Leasing's demands to collect on an impossible lease equipment contract are utterly unfair, unjust, unreasonable, fraudulent and in bad faith all at once.

53. Plaintiff is informed and believes and thereon alleges that PoshVille has already paid about $33,000 towards this lease equipment contract to Pawnee

Leasing for which Pawnee Leasing has paid Lilliput only $19,418 on or about December 2017. This whole lease contract was an egregious interference by Pawnee Leasing into the existing contract PoshVille had with Lilliput for the purchase of the playhouses it designed/chosen for its venue. Thus, Pawnee Leasing has been unjustly enriched by the transfer of the equipment ownership rights from PoshVille to Pawnee Leasing, and for the multitude of ways it has charged PoshVille by hidden fees, interests, penalties, ownership taxes and more, none of which were listed in the lease agreement itself, as alleged in greater detail in the prior portions of this complaint.

54. Plaintiffs allege and belief that Pawnee Leasing has essentially chosen to early terminate its part of the lease agreement by forfeiting its rights to the lease equipment and by refusing to permit PoshVille to return the equipment to Pawnee Leasing for the 20% cost, as the lease agreement allows. Yet, with full knowledge that it's lease equipment is not in use or operation, nor is something it allows to be returned to it, Pawnee Leasing wants PoshVille to perform unilaterally, when it is not. Pawnee Leasing demands to collect all of the contract term $57,240, when itself is not, and extra $8000 as of February 2021 in fees, charges, interests, insurance penalty [when no insurance is available on the market for PoshVille's non-operational status], and other

gravely and utterly unconscious fees, are all decisions and acts in bad faith for its unilateral financial gain and unjust enrichment.

55.  Therefore, this Court's intervention is required to step in for small businesses and their owners, and here, to discharge the lease equipment contract in question between PoshVille (lessee) and Pawnee Leasing (lessor), and discharge PoshVille and any and all personal guarantors under that contract, from having to continue to make any further payments on a non-operational lease equipment (two playhouses), to transfer title to the equipment to PoshVille as its rightful owner, and to allow PoshVille to dispose of this equipment in any manner deemed appropriate. PoshVille further seeks actual and consequential damages, attorney costs and fees, and punitive damages for Pawnee Leasing's misrepresentations, bad faith, and breach of fair dealing.

56. Impossibility of performance is a contractual doctrine recognized in practically all jurisdictions, including California and Colorado as relevant here. Since the equipment lease contract for the two pretend children's playhouses between Pawnee Leasing and PoshVille cites Colorado law as the governing law, as such, citations below are being made to Colorado authority. However, because all events occurred in California, and the lease equipment subject of the lease contract is in California, California statutory

law that has codified this doctrine in Cal.Civ.Code § 1511: "Causes excusing performance" and independently actionable unlawful business practices under Cal. Bus. & Prof. Code § 17200, should also be applied here, as cited below.

57. Impossibility/Impractically of performance doctrine discharges a party's duty to perform when the party's performance was made impracticable through no fault of the party by the occurrence of an event, the nonoccurrence of which was a basic assumption on which the contract was made. (*City of Littleton v. Emp'rs Fire Ins. Co*., 169 Colo. 104, 108, 453 P.2d 810, 812 (1969).

58. Discharge of contract is also appropriate by supervening unexpected impracticability, as the Covid-19 global pandemic in this case. Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary (See *Ruff v. Yuma Cnty. Transp. Co*., 690 P.2d 1296, 1298 (Colo. App. 1984) (inquiring whether an unanticipated circumstance made performance of the promise substantially different from what should have reasonably been within the contemplation of the parties; *City of Littleton*,

169 Colo. at 108, 453 P.2d at 812 (defining impossibility to include "impracticability because of extreme and unreasonable difficulty, expense, injury, or loss involved").

59. Cal.Civ.Code § 1511 "Causes excusing performance" has codified this doctrine into a statute that reads as follows: "The want of performance of an obligation, or of an offer of performance, in whole or in part, or any delay therein, is excused by the following causes, to the extent to which they operate: 1. When such performance or offer is prevented or delayed by the act of the creditor, or by the operation of law, even though there may have been a stipulation that this shall not be an excuse; however, the parties may expressly require in a contract that the party relying on the provisions of this paragraph give written notice to the other party or parties, within a reasonable time after the occurrence of the event excusing performance, of an intention to claim an extension of time or of an intention to bring suit or of any other similar or related intent, provided the requirement of such notice is reasonable and just; 2. When it is prevented or delayed by an irresistible, superhuman cause, or by the act of public enemies of this state or of the United States, unless the parties have expressly agreed to the contrary; or, 3. When the debtor is induced not to make it, by any act of the creditor intended or naturally tending to have that effect, done at or before the time at

which such performance or offer may be made, and not rescinded before that time."

60. California's unfair business practices law borrows violations of other laws and treats them as independently actionable unlawful business practices. Cal. Bus. & Prof. Code § 17200. "unfair competition . . . include[s] any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof Code § 17200. To state a claim, a plaintiff must plead a violation of another statute or common law.

61. "A person who is unjustly enriched at the expense of another is subject to liability in restitution." Restatement (Third) of Restitution and Unjust Enrichment § 1. "A person is unjustly enriched when he benefits as a result of an unfair detriment to another." Lewis v. Lewis, 189 P.3d 1134, 1141 (Colo. 2008)(en banc)(citing Salzman v. Bachrach, 996 P.2d 1263, 1265 (Colo. 2000)(en banc)). "The proper remedy upon a finding of unjust enrichment is to restore the harmed party 'to the position he formerly occupied either by the return of something which he formerly had or by the receipt of its monetary equivalent.'" Lewis v. Lewis, 189 P.3d at 1141 (quoting Restatement (First) of Restitution § 1, cmt. a).

62. As to Covid-19 pandemic, the wave of emergency governmental orders issued at federal, state, and local levels beginning in March 2020 were

designed to stop the spread of COVID-19. All indoor entertainment venues like PoshVille was operating for children indoor play and party have been shut down since mid-March 2020. There were also various stay-at-home orders issued in Los Angeles County, unprecedented in their breath, where the business is located. As illustrated below, these laws directly applicable to the Plaintiff made and continue to make it illegal to operate the business, allow guests at the facility, or leave one's home at all during the stay-home orders.

63. Plaintiff requests for this Court to take judicial notice of the below undisputed public records. Courts may take judicial notice of matters either that are "generally known within the trial court's territorial jurisdiction" or that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Specifically, "[the Court] may take judicial notice of undisputed matters of public record, ... including documents on file in federal or state courts." *Harris v. Cty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012).

64. The United States Secretary of Health and Human Services declared the Covid-19 pandemic to be a public health emergency on January 31, 2020.

65. The Centers for Disease Control and Prevention confirmed on February 26, 2020 that Covid-19 had been diagnosed in a patient in the United States.

66. Los Angeles County, California, is where the business and the playhouses that are the "lease equipment" under the lease contract are located. California's Governor Newsom issued Executive Order N-33-20, widely referred to as a stay-at-home order, on March 19, 2020 ordering people to stay home and restricting all indoor family entertainment operations, among many other restrictions. The Order reads as mandatory: "I ... order all individuals living in the state of California to stay at home or at their personal residence ... [except for essential tasks]." The Order also derives its authority from California Government Code section 8567, which requires that, when a state of emergency is declared, the governor's orders "shall have the force and effect of law." Violation of the Order is punishable as a misdemeanor and subject to fines of up to $1,000, under Government Code section 8665. The Order, then, makes it "illegal" to leave one's home-of course with broad exceptions, or to operate business that has been ordered to shut down.

67. As of February 12, 2021, "All individuals living in the State of California are currently ordered to stay home or at their place of residence, except for permitted work, local shopping or other permitted errands, or as otherwise authorized (including in the Questions and answers below)."

https://covid19.ca.gov/stay-home-except-for-essential-needs/ (last visited Feb. 12, 2021).

68. The coronavirus disease 2019 ("COVID-19") is a pandemic that has spread around the world, within the United States of America, and in California. See Coronavirus disease 2019 (COVID-19), Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/coronavirus/symptoms-causes/syc-20479963 (last visited Oct. 12, 2020) ("Mayo Clinic").

69. As of February 12, 2021, statistics published by the Centers for Disease Control and Prevention (CDC), there have been 27,229,862 cases in the US, and 473,699 deaths. https://covid.cdc.gov/covid-data-tracker/#cases_totalcases (last visited Feb. 12, 2021).

70. As of February 12, 2021, according to the California Department of Public Health, there have been 3,381,615 cases in California, and 46,002 deaths. https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/ncov2019.aspx. (last visited Feb. 12, 2021).

71. COVID-19 is a contagious disease that is spread through respiratory droplets that are released when infected individuals cough, sneeze, or talk. See Mayo Clinic.

72. Risk factors for COVID-19 are close contact -- typically defined as within six feet -- with someone who has COVID-19, or when a person infected with

COVID-19 coughs or sneezes on others. See Mayo Clinic; COVID-19 Basics: Symptoms, Spread and Other Essential Information About the New Coronavirus and COVID-19, Harvard Medical School (March 2020), https://www.health.harvard.edu/diseases-and-conditions/covid-19-basics.

73. Because many people who have COVID-19 do not know they have been infected, healthcare officials recommend that all people limit person-to-person contact, stay six feet apart, wash hands frequently, wear masks, cover coughs and sneezes, and avoid large gatherings. See How to Protect Yourself & Others, The Centers for Disease Control and Protection, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited Oct. 12, 2020); Furukawa COVID-19 Transmission Paper.

74. The risk of transmission is heightened in indoor environments, where infectious droplets may linger for longer periods of time. See Nathan W. Furukawa et al., Evidence Supporting Transmission of Severe Acute Respiratory Syndrome Coronavirus 2 While Presymptomatic or Asymptomatic, Emerging Infections Diseases, Vol. 26, Num. 7 (July 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-1595_article.

75. Plaintiff is informed and believes and thereon alleges that it is difficult to conceive how PoshVille could, legally and without violations of any Covid-

19 laws that prevent its operation of the play and party venue and the lease equipment therein, continue to perform on a contract that has been rendered illegal/impossible/impractical for all reasons described above.

76. Plaintiff is informed and believes and thereon alleges that PoshVille has already paid about $33,000 towards this lease equipment contract to Pawnee Leasing for which Pawnee Leasing has paid Lilliput only $19,418 on or about December 2017. This whole lease contract was an egregious interference by Pawnee Leasing into the existing contract PoshVille had with Lilliput for the purchase of the playhouses it designed/chosen for its venue. Thus, Pawnee Leasing has been unjustly enriched by the transfer of the equipment ownership rights from PoshVille to Pawnee Leasing and by collecting $13,582 over the purchase price since inception of the contract. Presently, Pawnee Leasing's demand that PoshVille (1) fully pay on the 5-year lease without Pawnee Leasing providing the consideration of an operating equipment or (2) demanding another $25,000 on a shuttered lease on top of about $33,000 collected is egregious breach of good fair and fair dealing covenants and should not be tolerated. Such bad faith conduct simply has no place in conscience or law.

77. Therefore, this Court's intervention is required to discharge the lease equipment contract in question between PoshVille (lessee) and Pawnee

Leasing (lessor), and discharge PoshVille and any and all personal guarantors under that contract, from having to continue to make any further payments on a non-operational lease equipment (two playhouses), to transfer title to the equipment to PoshVille as its rightful owner, and to allow PoshVille to dispose of this equipment in any manner deemed appropriate. PoshVille further seeks restitution, actual, consequential, declaratory relief, and punitive damages, and attorney costs and fees, for Pawnee Leasing's misrepresentations, unjust enrichment, bad faith, and breach of fair dealing.

78. This Court and/or Jury should provide same remedies to the similarly situated entities of the class.

## <u>CAUSES OF ACTION RELATING TO THE DEFENDANTS FAILURE</u>

## <u>TO DISCLOSE LEASE TERMS</u>

**By Plaintiffs Against All Defendants,**

**and Does 1 through 10, Inclusive**

<u>COUNT NINE</u>: TRUTH IN LENDING ACT (15 U.S.C. 1601, et seq.)

<u>COUNT TEN</u>: CONSUMER LEASING ACT  (15 U.S.C. §§ 1667–1667f)

<u>COUNT ELEVEN</u>: VIOLATION OF THE COLORADO CONSUMER

PROTECTION ACT

<u>COUNT TWELVE</u>: VIOLATION OF WASHINGTON'S CONSUMER

PROTECTION ACT

<u>COUNT THIRTEEN</u>: BREACH OF IMPLIED COVENANT OF FAIR

DEALING

<u>COUNT FOURTEEN</u>: BREACH OF IMPLIED COVENANT OF GOOD

FAITH

<u>COUNT FIFTEEN</u>: TORTIOUS INTERFERENCE

<u>COUNT SIXTEEN</u>: UNJUST ENRICHMENT

79. Plaintiff re-alleges and incorporates paragraphs above, as though fully set forth at this point.

80. Plaintiff is informed and believes and thereon alleges that Individual Defendants, as well as Pawnee Leasing and First Pacific Funding,

maliciously collaborated with and participated in the various actions undertaken to ensure deception and materially misrepresentation of the contract that was to be for purchase of the two playhouses by PoshVille from Lilliput at an agreed price of $19,418 and framed it to be "a lease equipment contract" where Pawnee Leasing became the owner of the said playhouses and turned around to lease it back to PoshVille for utterly unfair and unjust lease equipment contract terms. It also turned into theft of PoshVille's intellectual property, because at least one of the playhouses was designed/chosen by LS, for PoshVille's unique use.

81. Plaintiff inform and believes that this conduct to turn a purchase funding contract into a lease agreement between a small business and Pawnee Leasing was purposely done to avoid the federal protections strictly installed in the Truth-In-Lending Act and the Consumer Leasing Act exactly to avoid big financiers like Pawnee Leasing and First Pacific Funding from taking unfair advantage of borrowers and lessees as here. Pawnee Leasing and First Pacific Funding have purposely found a loophole to do that what Congress does not allow and this Court and/or Jury should step in to protect the small businesses run by small families of America, like PoshVille here, and now shut down due to Covid-19, facing grave loss of their businesses and financial turmoil.

82. The Truth–In–Lending Act (TILA) which encompasses the Consumer Leasing Act (CLA), was passed "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit...." 15 U.S.C. § 1601 (emphasis added). TILA is a remedial statute designed to protect borrowers who are viewed as not being on an equal footing with lenders. *Bizier v. Globe Fin. Serv., Inc.*, 654 F.2d 1, 3 (1st Cir.1981). Consequently, TILA and CLA provisions are to be construed liberally in favor of borrowers. *Id.* See also *Gallegos v. Stokes*, 593 F.2d 372, 376 (10th Cir.1979) (citing *Rachbach v. Cogswell*, 547 F.2d 502, 505 (10th Cir.1976)). Additionally, "[a] proven violation of the disclosure requirements is presumed to injure the borrower by frustrating the purpose of permitting consumers to compare various available credit terms." *Herrera v. First Northern Sav. and Loan Ass'n*, 805 F.2d 896, 901 (10th Cir.1986) (citing *Dzadovsky v. Lyons Ford Sales, Inc.*, 593 F.2d 538, 539 (3d Cir.1979)).  The act provides that it is (1) supplemented by other applicable statutory provisions and by general principles of law and equity, unless they are inconsistent with the act's provisions and (2) not to be construed to limit or restrict in any way rights or remedies available to a lessee or another person under other statues or principles of law and equity.

83. First, here, the lease contract drafted by Pawnee Leasing and First Pacific Funding, that was consummated by the signature of PoshVille and Pawnee Leasing, fails to accurately disclose the amount paid by PoshVille as deposit to Pawnee Leasing by way of a check number 107 in an amount of $731.75 and cashed by Pawnee Leasing on January 8, 2018. No where in the contract does this amount appear. Further, while Pawnee Leasing demanded to collect all monthly payments as ACH transactions, it directed for PoshVille to send this deposit as a check only. Pawnee Leasing than took a substantial time to cash this check and later has charged a $100 late fee and recurring interest every month since December 2017 until present time, totaling an utterly unreasonable fee. In a multititle of emails, PoshVille has asked for this late fee and later interest charges to be waived, but Kathy, Kenny, Amanda and Becca at Pawnee Leasing have all refused to do so. The failure to include the $731.75 deposit in the lease contract paid by PoshVille for the benefit of Pawnee Leasing at the consummation of the lease and towards it is a direct violation of CLA. Section 213.4(g)(2) of Regulation M (CLA) states: "The total amount of any payment, such as a refundable security deposit paid by cash, check or similar means, advance payment, capitalized cost reduction or any trade-in allowance, appropriately identified, to be paid by the lessee at consummation of the lease."

84. Second, another violation of the lease contract is in failure to comply with requirement of Regulation M (CLA) found at section 212.4(g)(4) indicating that lessors must disclose the "total amount paid or payable by the lessee during the lease term for official fees, registration, certificate of title, license fees, or taxes." While Pawnee Leasing has sent personal property tax bills to PoshVille for reimbursement that it purportedly pays to Los Angeles County as the title owner, no where in the lease contract does it mention the tax liability monthly or annually that PoshVille will incur for the personal property tax it is later billed for. To that end, Los Angeles County separately has sent PoshVille personal property bill for PoshVille, which PoshVille has paid directly to the Los Angeles County.

85. The third violation is that the lease contract fails to disclose the charge for not having "equipment insurance" that turned out different to what initially was requested in order to consummate the contract. Indeed, Pawnee Leasing charged PoshVille $210 for 10 months as fee for lack of this insurance and neither Jill from First Pacific Funding nor Becca and Kenny from Pawnee Leasing would timely respond to explain how to avoid this fee. The lease agreement is absolutely silent as to the charge or method for determining the charge. In May 2019, PoshVille was finally able to get an answer as to how to avoid this fee and obtained an equipment insurance that only cost is $100 for

the whole year, prorated to $50 for the half-year. When this insurance expired in November 2020, the carrier and all other carriers refused to renew insurance because PoshVille was non-operational due to Covid. Pawnee Leasing began charging PoshVille $210 a month for lack of this insurance when its lease equipment was simply uninsurable at this time. All the $210 a month fees by Pawnee Leasing relating to the insurance are in direct violation of Section 212.4(g)(4) of Regulation M (CLA), because the lease agreement is absolutely silent on these fees and the amount that may be imposed.

86. The fourth violation is that the lease contract misleads the "total cost of the contract" on the first page to be "$21,054.19," when indeed, total cost of the five-year lease contract would be $52,494.75, and after this 5-year lease term, the contract requires the playhouses to be returned to Pawnee Leasing, or if PoshVille chose to keep them in the venue, PoshVille had to keep paying 50% of the monthly payment for life ($477 a month), or PoshVille could choose to purchase the playhouses from Pawnee Leasing at the 20% value of the contract price. This again is in direct violation of Section 212.4(g)(4) of Regulation M (CLA). "The lessor must disclose the total amount paid or payable by the lessee during the lease term.... Lessors often only disclose the amount to be paid in taxes and fees at the lease's inception, during the lease's first year, or how much of each lease payment goes to these fees. These

disclosures are not adequate; the total of all fees to be paid during the lease term must be disclosed, even if this amount is only a reasonable estimate." Truth in Lending, Consumer Credit and Sales Legal Practices Services, National Consumer Law Center, § 0.2.1.7, p. 112 (1988 Cum.Supp.).

87. Because the "lease equipment" contract was for a small family-run business, both the express terms and the spirit of the CLA should apply directly as alleged above for the four violations on the face of the lease contract or, at the very least, through the other statutory and equitable doctrines alleged herein under counts 11 to 16 below.

88. The Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101 et. seq., was enacted to regulate commercial activities and practices which, "because of their nature, may prove injurious, offensive, or dangerous to the public." *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc*., 62 P.3d 142, 146 (Colo. 2003) (quoting *People ex rel. Dunbar v. Gym of America, Inc*., 177 Colo. 97, 493 P.2d 660, 667 (1972)). Thus, the CCPA "deters and punishes businesses which commit deceptive practices in their dealings with the public by providing prompt, economical, and readily available remedies against consumer fraud." *Id*. (citations omitted). In order to prove a violation of the CCPA, a plaintiff must show that: (1) the defendant engaged in an unfair or deceptive trade practice; (2) the challenged practice occurred in the

course of defendant's business, vocation, or occupation; (3) it significantly

impacts the public as actual or potential consumers of the defendant's goods,

services, or property; (4) the plaintiff suffered injury to a legally protected

interest; and (5) the challenged practice caused the plaintiff's injury. *Hall v.*

*Walter*, 969 P.2d 224, 235 (Colo. 1998).

89. The Washington Consumer Protection Act, where Defendant First Pacific

Funding is from, the plaintiff must prove: (1) an unfair or deceptive act or

practice; (2) occurring in trade or commerce; (3) affecting the public interest;

(4) injury to a person's business or property; and (5) causation. Wash. Rev.

Code Ann. § 19.86.010 et seq.

90. As to implied covenant of fair dealing and good faith, 'the underlying

principle is that there is an implied covenant that neither party shall do

anything which will have the effect of destroying or injuring the right of the

other party to receive the fruits of the contract; in other words, in every

contract there exists an implied covenant of good faith and fair dealing.' 5 S.

Williston, Contracts § 670, at 159 (3d ed. 1961)". Under Colorado law

specifically, it has been held, "[e]very contract contains an implied duty of

good faith and fair dealing." *Wells Fargo Realty Advisors Funding, Inc. v.*

*Uioli, Inc.*, 872 P.2d 1359, 1362 (Colo.App.1994).

91. In order to establish tortious interference, Plaintiff must show: (1) "the plaintiff had a contract with another party;" (2) "the defendant knew or should have known of such contract's existence;" (3) "the defendant intentionally induced the other party to the contract not to perform the contract with the plaintiff;" and (4) "the defendant's actions caused the plaintiff to incur damages." (*Lutfi v. Brighton Cmty. Hosp. Ass'n*, 40 P.3d 51, 58 (Colo. App. 2001) (citation omitted).

92. "A person who is unjustly enriched at the expense of another is subject to liability in restitution." Restatement (Third) of Restitution and Unjust Enrichment § 1. "A person is unjustly enriched when he benefits as a result of an unfair detriment to another." *Lewis v. Lewis*, 189 P.3d 1134, 1141 (Colo. 2008)(en banc)(citing *Salzman v. Bachrach*, 996 P.2d 1263, 1265 (Colo. 2000)(en banc)). "The proper remedy upon a finding of unjust enrichment is to restore the harmed party 'to the position he formerly occupied either by the return of something which he formerly had or by the receipt of its monetary equivalent.'" *Lewis v. Lewis*, 189 P.3d at 1141 (quoting Restatement (First) of Restitution § 1, cmt. a).

93. Plaintiff is informed and believes and thereon alleges that PoshVille has already paid about $33,000 towards this lease equipment contract to Pawnee Leasing for which Pawnee Leasing has paid Lilliput only $19,418 on or

about December 2017. This whole lease contract was an egregious interference by Pawnee Leasing into the existing contract PoshVille had with Lilliput for the purchase of the playhouses it designed/chosen for its venue. Thus, Pawnee Leasing has been unjustly enriched by the transfer of the equipment ownership rights from PoshVille to Pawnee Leasing and by collecting $13,582 over the purchase price since inception of the contract. Presently, Pawnee Leasing's demand that PoshVille (1) fully pay on the 5-year lease without Pawnee Leasing providing the consideration of an operating equipment or (2) demanding another $25,000 on a shuttered lease on top of about $33,000 collected is egregious breach of good fair and fair dealing covenants and should not be tolerated. Such bad faith conduct simply has no place in conscience or law.

94. Plaintiff is informed and believes and thereon alleges that the most recent invoice for outstanding balance from Pawnee Leasing includes fees, interests charges, late fees, lack of insurance fees not only that were not disclosed in the lease agreement, but are utterly unconscionable and in bad faith on their own. These include, but are not limited to the following:

   ▪ The invoice includes all the late fees and interest on the $731.75 check as deposit from PoshVille it cashed on January 8, 2018,

however, this deposit does not appear anywhere in the lease

agreement.

- The invoice includes the full monthly rent of $954.45 for months of

  December 2020, January and February 2021, when Pawnee Leasing

  knows that PoshVille has been evicted from its physical location, the

  play and party business is shut down due to Covid, and its lease

  equipment is non-operational in the storage. Indeed, Pawnee Leasing

  has forfeited any claims for further monthly payments as it does not

  wish, per Kenny, for the return of its lease equipment under any

  circumstance.

- The invoice includes late charges of $143.17 from October 2020 to

  February 2021 while PoshVille was in approved forbearance and

  paid Pawnee Leasing $477 a month until December 2020 even when

  the business was evicted from its physical location and the business

  itself shut down by government orders due to Covid 19.

- The invoice includes the $210.54 a month "No Proof of Insurance"

  fee imposed since November 25, 2020, when the existing insurance

  expired and the insurance companies refused to renew and/or

  provide new insurance to a non-operational business as PoshVille is

  at this time.

- The invoice includes Los Angeles County taxes since 2018 that Pawnee Leasing as the owner of the lease equipment should be presumably liable for.

- The invoice includes a multitude of finance charges and late fees that is difficult to discern and understand.

95. Therefore, this Court's intervention is required to discharge the lease equipment contract in question between PoshVille (lessee) and Pawnee Leasing (lessor), and discharge PoshVille and any and all personal guarantors under that contract from having to continue to make any further payments on a non-operational lease equipment (two playhouses), to transfer title to the equipment to PoshVille as its rightful owner, and to allow PoshVille to dispose of this equipment in any manner deemed appropriate. PoshVille further seeks restitution, actual, consequential, declaratory relief, and punitive damages, and attorney costs and fees, for Pawnee Leasing's misrepresentations, unjust enrichment, bad faith, and breach of fair dealing.

96. This Court and/or Jury should provide same remedies to the similarly situated entities of the class.

**WHEREFORE, Plaintiffs respectfully requests that this Court**:

(1) Plaintiffs hereby demand trial by jury as to the issues so triable;

(2) Discharge of Lease Equipment Contract between Pawnee Leasing and PoshVille, Inc., and discharge of any liability under the contract to PoshVille, Inc. and any and all personal guarantors under the agreement.

(3) General damages and special damages according to proof;

(4) Punitive damages as allowed by law;

(5) Attorneys fees and costs:

(6) Mandatory injunctive relief, both preliminary and permanent, as allowed by law, (including preliminary injunctive relief based upon a separate application);

(7) Restitution of rights and Declaratory Relief;

(8) Costs of suit incurred herein; and

(9) All of the above-noted relief for the members of the Class if certified.

(10) Such further relief as the Court deems just and proper.


Date:  February 17, 2020                                     Serobian Law, Inc.



                                                 ____/S/ Liana Serobian_____
                                                 Serobian Law, Inc.
                                                 Attorney for Plaintiffs